UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| STEPHEN L. DAVIS and CITY OF ST. CLAIR SHORES POLICE AND FIRE RETIREMENT SYSTEM, Derivatively on Behalf of ACUITY BRANDS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> VERNON J. NAGEL, RICHARD K. REECE and MARK A. BLACK, <br><br> Defendants. <br><br> – and – <br><br> ACUITY BRANDS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. |

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

<u>DEMAND FOR JURY TRIAL</u>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

1.      This is a shareholder derivative action on behalf of nominal defendant Acuity Brands, Inc. ("Acuity" or the "Company") for breach of fiduciary duty, unjust enrichment, contribution, and indemnification against defendants Vernon J. Nagel, Richard K. Reece, and Mark A. Black (together, "defendants").  Defendants, at all relevant times, served as senior executives of Acuity.

2.      Based in Atlanta, Georgia, Acuity is a leading provider of lighting and building management solutions for commercial and residential applications in North America.  Acuity experienced great success and rapid growth in the early 2000s, which coincided with non-residential construction and a transition to solid-state LED lighting.  Acuity's growth was fueled in material part by its lucrative relationship with The Home Depot, Inc. ("Home Depot"), which accounted for 10%-15% of Acuity's net sales every fiscal year between 2003 and 2015.  However, by mid-2015, and unbeknownst to the public, Acuity's impressive rate of organic growth had faltered.

3.      Rather than disclose these adverse developments, defendants embarked upon an unlawful scheme to maintain the trading price of Acuity common stock at artificially inflated levels.  Specifically, defendants, despite knowledge of the true facts, repeatedly misled Acuity shareholders about the adverse impact of increased

competition on the Company's business and prospects for future revenue and earnings growth. While the Company's stock price was artificially inflated because of this scheme, defendants took advantage by collectively selling at least $49 million worth of their personally held Acuity shares.

4.     Due to defendants' misrepresentations and material omissions, Acuity shareholders sued the Company and others for violations of the federal securities laws in an expensive and costly-to-defend class action lawsuit. *See In re Acuity Brands, Inc. Securities Litigation*, No. 1:18-cv-2140-MHC (N.D. Ga.) ("Securities Action").

5.     On August 12, 2019, the United States District Court for the Northern District of Georgia, the Honorable Mark H. Cohen presiding, sustained (in part) the shareholder plaintiffs' claims for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against the Company, notwithstanding the materially heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Judge Cohen found, *inter alia,* that considering allegations based on the accounts of confidential witnesses, defendants' access to internal quarterly and daily reports supported an inference of scienter for defendants, as Acuity's top officers, related to their public statements discounting the effect of competition. Judge Cohen further concluded that facts were alleged to

show that "sales to Home Depot were sufficiently large to constitute a core part of Acuity's business," and coupled with allegations that the Acuity officers received quarterly reports (the "Quarterly Record Briefs") and that defendants Nagel and Reece had access to daily sales reports, "knowledge of sales to Home Depot may be imputed to [the Acuity Officers]." *In re Acuity Brands Sec. Litig.*, No. 1:18-cv-2140-MHC, 2019 U.S. Dist. LEXIS 231099, at *77-*78 (N.D. Ga. Aug. 12, 2019). Moreover, Judge Cohen concluded that the size and timing of defendants' challenged insider stock sales during the Securities Action class period supported an inference of scienter.

6.     By misleading Acuity shareholders and insider selling, defendants breached their fiduciary duty to avoid self-dealing and the dissemination of false company information and unjustly enriched themselves at Acuity's expense. Nevertheless, Acuity's Board of Directors (the "Board"), has not, and will not, take legal action against defendants.  This fact is borne out by the Acuity Board's decision to effectively ignore plaintiffs' litigation demands.

7.     Delaware corporation law requires a board of directors to timely accept or reject a litigation demand.  A board cannot lawfully defer or otherwise ignore its legal obligation to respond to a litigation demand.  But this unlawful course of action is precisely the one chosen by Acuity's Board.  Worse yet, while failing to discharge

its own fiduciary duties, the Acuity Board is abetting defendants' defense of myriad lawsuits triggered by their knowing violations of the federal securities and Delaware corporation laws.

8.     The best interests of Acuity plainly are not top of mind for the Company's Board.  Accordingly, plaintiffs bring this action to further Acuity's best interests.   The derivative claims asserted this Complaint will protect Acuity's valuable claims against defendants and once finally adjudicated, make Acuity whole for damages and injuries suffered due to defendants' unlawful misconduct.

<h3 style="text-align:center">JURISDICTION AND VENUE</h3>

9.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 because plaintiffs' claims raise a federal question under §10(b) of the Exchange Act, 15. U.S.C. §78j(b), and §21D of the Exchange Act, 15 U.S.C. §78u-4(f).  The Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has personal jurisdiction over each of the defendants because each defendant is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United

States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, Acuity is a corporation conducting business and maintaining operations in this District.

11.     Venue is proper in under 28 U.S.C. §1391 because: (a) Acuity maintains its principal executive offices in this District; (b) one or more of the defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein took place in this District; and (d) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

13.     Plaintiffs Stephen L. Davis[1] and City of St. Clair Shores Police and Fire Retirement System ("St. Clair") are, and continuously have been, Acuity shareholders since 2005 and 2010, respectively.  Plaintiffs will adequately represent Acuity's interests in the derivative claims asserted in this action.

14.     Nominal defendant Acuity is incorporated in Delaware and maintains its principal executive offices at 1170 Peachtree Street, NE, Suite 2300, Atlanta, Georgia 30309-7676.  Acuity is the parent company of Acuity Brands Lighting, Inc. The Company's shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "AYI."

15.     Defendant Vernon J. Nagel ("Nagel"), the Company's Executive Chairman, previously served as Chairman and Chief Executive Officer ("CEO") of Acuity from September 2004 until February 2020 and served as President of Acuity from August 2005 until August 2019.

16.     Defendant Richard K. Reece ("Reece"), the Company's Executive Vice President, previously served as Acuity's President from September 2019 until February 2020, as an Executive Vice President of Acuity from September 2006 until

---

[1]     On February 11, 2020, Freda C. Davis named her husband, Stephen L. Davis, as her agent and granted him power of attorney due to medical reasons.

September 2019, and as Acuity's Chief Financial Officer ("CFO") from December 2005 until September 2019.

17.   Defendant Mark A. Black ("Black") formerly served as an Executive Vice President of Acuity from January 2013 and as President of one of the Company's subsidiaries, Acuity Brands Lighting, Inc., from March 2014 until his retirement in June 2018.

18.   Collectively, defendants Nagel, Reece, and Black are referred to as the "defendants."

## DEFENDANTS' FIDUCIARY DUTIES

19.   In *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."  The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)."  *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *35 (Del. Ch. July 12, 2010).

20.   Moreover, "[u]nlike directors, corporate officers cannot be shielded from personal liability by 8 *Del. C*. §102(b)(7), which permits a corporation to offer

such protection to directors in a corporate charter." *Hampshire Grp*., 2010 Del. Ch. LEXIS 144, at *43; *Chen v. Howard-Anderson*, 87 A.3d 648, 686-87 (Del. Ch. 2014) (holding "the Exculpatory Provision [under §102(b)(7)] does not protect [the CEO] when acting in his officer capacity").

21.    Instead, under Delaware law, corporate officers "face a statutory exposure to liability that is often greater than directors." *Hampshire Grp*., 2010 Del. Ch. LEXIS 144, at *43; *see also Amalgamated Bank v. Yahoo! Inc*., 132 A.3d 752, 780-81 (Del. Ch. 2016) (holding that officers owe fiduciary duties identical to those of directors, but adding that officers are also "agents who report to the board of directors" and "have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles").

22.    Here, defendants Nagel, Reece, and Black, at all relevant times, served as the principal executive officers of Acuity.   Therefore, defendants "cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7)," but rather "can be held liable in damages to [Acuity] if they acted with gross negligence and caused injury to the corporation." *Hampshire Grp*., 2010 Del. Ch. LEXIS 144, at *43-*44.  As detailed below, it is clear that defendants, and each of them, breached their fiduciary duties of care and loyalty to Acuity by making materially false and misleading statements about the Company's business and prospects, and further breached their

fiduciary duty of loyalty by selling nearly $49 million worth of Acuity shares at artificially inflated prices while they, but not the market, were aware of non-public adverse information.

23.     Additionally, as a part of their duties of care and loyalty, defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to Acuity shareholders, or the market generally, about the business of the corporation.  *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures.  The law of partial disclosure is likewise clear: 'Once defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the

defendants breached their fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

24. As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10 (Del. Ch. Aug. 15, 2007), "[w]hen . . . directors communicate with shareholders, they also must do so with **complete candor**":

> Loyalty.  Good faith.  Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives.  Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

*Id*. at *10-*11.  These strict disclosure obligations apply to defendants, as officers of a Delaware corporation, with equal force.  *Gantler*, 965 A.2d at 709; *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *34-*35.

25. Moreover, with respect to the insider sales made by defendants, it is black-letter Delaware law that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).  Where corporate officers and directors: (a) are in possession of material, non-public company information; and (b) use that information in making stock sales which are motivated, in whole or in part, by the

substance of that information, they have breached their non-exculpable fiduciary duty of loyalty. *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

26.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

27.     During all relevant times, defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they were. In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

28.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise defendants' violations of law, including breaches of fiduciary duties, corporate waste, unjust enrichment, and violations of the federal securities laws; and (b) disguise and misrepresent the Company's actual business and financial prospects.

29.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.   Because the actions described herein occurred under the authority of the Board, each of defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

30.    Each of the defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and in furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

31.    Acuity is a leading provider of lighting and building management solutions for commercial and residential applications in North America.   The Company's lighting and building management solutions are marketed under numerous brand names, including, but not limited to, Lithonia Lighting, Holophane, and Winona Lighting.   The Company's lighting solutions include devices such as luminaires, lighting controls, lighting components, power supplies, prismatic

skylights, LED lamps, and integrated lighting systems for indoor and outdoor applications used in new construction, renovation, and maintenance and repair applications.

32.    Acuity experienced great success and rapid growth in the early 2000s, which coincided with non-residential construction and a transition to solid-state LED lighting.  Acuity's growth was fueled in material part by its lucrative relationship with Home Depot, which accounted for 10%-15% of Acuity's net sales every fiscal year between 2003 and 2015.  However, by mid-2015, and unbeknownst to the public, Acuity's impressive rate of organic growth had faltered.  Significantly, the advent of LED technology brought with it a massive influx of new competitors, especially from overseas suppliers of small electronics.  These new competitors disrupted the traditional lighting market and steadily eroded Acuity's market share.

33.    Acuity suffered another setback when, just as competition among LED suppliers peaked, Acuity's most important customer, Home Depot, began shifting its business dramatically away from Acuity in favor of cheaper suppliers from overseas.[2]  As a consequence, by mid-2015, certain factors that had propelled

---

[2]    Whereas Home Depot had accounted for 10%-15% of Acuity's net sales each fiscal year from 2003 through 2015, during Acuity's fiscal year 2016 (running from September 1, 2015 through August 31, 2016), sales to Home Depot declined and ultimately accounted for less than 10% of Acuity's sales during that period.

Acuity's prior sales growth had weakened significantly, and Acuity faced deteriorating demand and vanishing prospects to drive the type of growth the Company had historically delivered to shareholders.

34.    Significantly, it has been alleged in the Securities Action, based on the accounts of multiple confidential witnesses, that defendants received and/or had access to quarterly and daily internal reports that showed declining sales and the negative impact competition was having on the Company's business and prospects. For example, based on confidential witness accounts, it is alleged that Acuity's Market Intelligence Group aggregated internal sales information and information from competitors and generated Quarterly Record Briefs for Acuity's senior management that analyzed market trends.  It has in turn been alleged, based on these Quarterly Record Briefs, that Acuity's officers were informed that LED prices were falling, that the LED market was flooded with competitors, and consequently that Acuity's sales were declining, and Acuity's growth was slowing.  It has similarly been alleged, based on confidential witness accounts, that defendants Nagel and Reece "received or had access to" daily reports reflecting all of Acuity's sales figures and "were actively tracking Acuity's declining sales due to increased competition and lowered prices in the LED market."

**Defendants' Misrepresentations and Material Omissions**

35.     Instead of acknowledging that these issues were adversely impacting Acuity's growth and performance, defendants concealed and misrepresented the true situation at the Company.  To this end, defendants made a series of public statements designed to artificially inflate the trading price of Acuity common stock and, in turn, the Company's market capitalization.   While the Company's stock price was artificially inflated because of these misleading public statements, defendants took full advantage, together selling $49 million of their personally held Acuity shares before the truth eventually emerged.

36.     Specifically, during a conference call held with analysts and investors on October 7, 2015, with respect to the impact of competition on the Company, defendant Nagel misrepresented that "[Acuity's] rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors for these types of products and solutions, demonstrating our market-leading prowess."   This statement was false or misleading for being dismissive of the effect of competition on Acuity's business while failing to disclose, or deliberately understating or discounting, the adverse impact increased competition was having on Acuity's business, including an increase in LED manufacturing competition that had contributed to a decline in growth, which defendants knew or recklessly disregarded.

- 15 -

37.    During the same October 7, 2015 conference call, defendant Nagel celebrated the Company's relationship with Home Depot, stating that Acuity was "driving growth" both for itself and its largest customer, stating:

> [T]he home-improvement channel – and as you know, we are strategic aligned with one particular customer [Home Depot] that we have a great partnership and we're driving growth both for them and for us, so we see them taking share.  We see them continuing to invest aggressively in the lighting solutions side of their business.
>
> . . . .  And with Acuity, in this case, Lithonia brand behind it, it really provides the opportunity for them to differentiate in both their light construction as well as remodel and residential side.  So we're seeing good growth.

These statements were false or misleading because they indicated Acuity was seeing "growth" in its relationship with Home Depot, when in fact sales to Home Depot were at the time declining, which defendants knew or recklessly disregarded.

38.    Less than a month later, on November 5, 2015, defendant Nagel exercised 71,600 Acuity common stock options and immediately sold these shares at a price of $215.19 per share (just shy of Acuity's all-time high stock price as of that time) for more than $15.4 million, netting an immediate profit of over $12.7 million.  This suspiciously timed stock sale represented nearly 28% of Nagel's total Acuity common stock holdings as of that date.

39.    Similarly, between November 3, 2015 and November 16, 2015, defendant Reece exercised a total of 22,320 Acuity common stock options,

immediately selling all of them at a price of approximately $217 per share (again, close to the Company's all-time high share price as of that time) and realizing a total profit of over $3.8 million.  These stock sales represented over 14% of defendant Reece's total Acuity common stock holdings at the time of the transactions.  And, on November 4, 2015, defendant Black exercised a total of 12,366 Acuity stock options, immediately selling all of them at an average price of $215.30 per share (just shy of the all-time high price as of that time) for an instant profit of approximately $1.45 million.  Defendant Black also sold an additional 4,807 Acuity shares at an average price of $215.18 on November 4, 2015, yielding over $1 million more in proceeds.  In total, defendant Black's sales of Acuity common stock represented over 26% of the shares he held as of November 4, 2015.

40.    Next, during a conference call held with analysts and investors on January 8, 2016, defendant Nagel once again minimized the impact of competition, stating:

> The competitive dynamics were again consistent with what we've seen. There's nothing that I would say would be noteworthy in terms of the pricing dynamics that would be outside the norm if you will.

> That doesn't mean that we don't experience, we're a bid business, that we don't experience some competitive pressures.  But I wouldn't call that out.

This statement was false or misleading for dismissing the effect of competition on Acuity's business while failing to disclose, or deliberately understating or discounting, the adverse impact increased competition was having on Acuity's business, including an increase in LED manufacturing competition that had contributed to a decline in growth, which defendants knew or recklessly disregarded.

41.    On April 6, 2016, the Company hosted another conference call with analysts and investors to discuss its second quarter of 2016 financial results.  As before, defendant Nagel again dismissed the impact of increased competition on Acuity's business, stating:

> [O]ur view is that there has been no real change in the trend, there has been no real change in how the competitors out there – it's a bid business for most of what we do.  And so we are competing every day. I don't know that we've seen any meaningful change in how our competitors compete.  So I would say that it's still kind of more of the same at this point.[3]

---

[3]    Defendant Reece also participated in Acuity's false and misleading quarterly earnings conference calls (October 7, 2015, January 8, 2016, and April 6, 2016). Reece, like Nagel, spoke to analysts and responded to their questions.  Nevertheless, despite knowing the true facts, none of the defendants corrected the materially false and misleading statements and/or misrepresentations about Acuity's business in general, and the adverse impact of increased competition.  Instead, defendants utilized these opportunities to sell their personal shares of Acuity common stock at artificially inflated prices based on adverse, material, non-public information in breach of their fiduciary duties to avoid self-dealing and legal obligations to disclose or refrain from trading.

- 18 -

This statement was false or misleading for dismissing the effect of competition on Acuity's business while failing to disclose, or deliberately understating or discounting, the adverse impact increased competition was having on Acuity's business, including an increase in LED manufacturing competition that had contributed to a decline in growth, which defendants knew or recklessly disregarded.

42.    Just days later, on April 11, 2016, defendant Black sold 2,678 shares of Acuity common stock at a price of $248.16 per share, for nearly $665,000 in proceeds.  Shortly thereafter, on April 20, 2016, defendant Nagel exercised an additional 8,865 Acuity common stock options and immediately sold these shares at $259.24 per share – mere pennies below Acuity's record high stock price of $260 as of that date – for nearly $2.3 million in proceeds and an immediate profit of over $1.8 million.  Just two days after that stock sale, on April 22, 2016, defendant Nagel exercised an additional 47,995 Acuity common stock options and immediately sold all the shares at a price of $256.18 per share for nearly $12.3 million, netting an immediate profit of over $9.9 million.  In total, defendant Nagel's stock sales on April 20, 2016 and April 22, 2016 represented nearly 23% of his Acuity common stock holdings at the time of those transactions.

43.    On June 29, 2016, Acuity hosted another conference call with analysts and investors.  In response to a question from an analyst, defendant Reece refuted

the suggestion that competitors were negatively impacting Acuity's sales or causing

Acuity to lower prices, representing instead that lower production costs led the

Company to lower prices for its products.  The exchange ensued as follows:

> [Analyst:]    [O]n the 2% price/mix; that is a little higher than recent quarters.
>
> You alluded to on the call that the driver of that was the LED component and other component price declines, but I just wanted to get a sense of was there a pickup there or was your reductions in price somewhat of a catch-up or [were] there competitive aspects at play? Any color would be helpful.
>
> [Reece:] I would say it is a slight pickup.  We have been saying 1%, so it is a slight pickup with rounding.
>
> *       *       *
>
> But I would say it is still predominantly due to passing on reduction in our input costs, predominantly LED, but we have seen some reduction in others that have caused that number to round to 2% instead of the 1%.

These statements were false or misleading for dismissing the effect of competition

on Acuity's business while failing to disclose, or deliberately understating or

discounting, the adverse impact increased competition was having on Acuity's

business, including an increase in LED manufacturing competition that had

contributed to a decline in growth, which defendants knew or recklessly disregarded.

44.    The following week, on July 6, 2016, defendant Black sold an

additional 2,654 shares of Acuity common stock at an average price of $250.27 for

over $664,000 in proceeds.  Just days later, on July 11, 2016, defendant Nagel exercised an additional 35,060 Acuity common stock options, immediately selling them at $268.27 per share – less than $2 below Acuity's all-time high stock price as of that date – netting an instant profit of over $7.6 million.  This additional sale represented nearly 15% of the shares defendant Nagel directly owned as of July 11, 2016.  And on that same day, defendant Reece exercised an additional 33,430 Acuity common stock options and immediately sold them at an average price of $269.07 per share – less than $1 below Acuity's all-time high stock price as of that date – netting an instant profit of over $7.3 million.  This sale represented over 20% of defendant Reece's Acuity common stock holdings as of July 11, 2016.

45.    On November 9, 2016, defendant Black exercised an additional 10,544 Acuity common stock options, immediately selling all of them at an average price of $243.05, realizing an instant profit of over $1 million.  Defendant Black also sold 3,762 shares on this date at an average price of $243.05, yielding over $914,000 in additional proceeds.  In total, Black's stock sales on November 9, 2016 represented over 27% of defendant Black's holdings at that time.  Collectively, defendants reaped at least $49 million in proceeds from their illicit stock sales.

**The Truth Is Revealed**

46.     Defendants' unlawful scheme continued unabated until early April 2017.  Then, on April 4, 2017, Acuity reported a third consecutive quarter of lower-than-expected sales growth, including net sales for the second fiscal quarter of 2017 of $804.7 million, an increase of only 3.5% over the prior year, which fell well below analysts' consensus expectations of $827.25 million in revenue.

47.     Significantly, Acuity reported a decrease in adjusted diluted EPS of $1.77 compared with the year prior.  With respect to sales volume, Acuity revealed that its growth had slowed to 4%, reflecting a dramatic decline even from the previous two quarters, which had disappointed investors, but in which the Company reported 13% and 10% increases in sales volume, respectively.

48.     In the press release announcing Acuity's second fiscal quarter of 2017 results, defendant Nagel described demand as "subdued," stating that "third-party forecasts suggest that the softness in market demand that began in the third calendar quarter of 2016 and continued through our second quarter may persist through the remainder of our fiscal 2017."  Even though Acuity had repeatedly cited third-party forecasts that predicted growth in the mid- to upper-single-digit range and emphasized Acuity's purported ability to outpace this growth rate, defendant Nagel now suggested, in the second quarter 2017 investor conference call, that "many

- 22 -

market forecasters now believe the market will be flat to slightly positive in the second half of fiscal 2017," and acknowledged that the Company expected growth to be "in the low single digits in the second half of fiscal 2017."

49.     Acuity's disappointing sales results for the quarter caused the relevant truth to be revealed and materialize, as these results effectively demonstrated that the Company's underlying organic growth and the actual demand for Acuity's products was far lower than defendants had previously led shareholders to believe, contrary to their repeated assurances.  Indeed, defendants acknowledged that the Company expected growth to be "in the low single digits in the second half of fiscal [year] 2017."  Such a rate of growth would not exceed, and would even lag, the expected growth for the broader lighting industry.  On this news, shares of Acuity common stock declined by $30.13 per share, or nearly 15%, to close on April 4, 2017 at a price of $173.93 per share.

50.     In the wake of these damaging disclosures, analysts promptly questioned the "reliability" of the basis for Acuity's previous statements, the truth of Acuity's growth story, and the Company's purported ability to outperform the broader lighting market on a sustained basis. For example, on April 4, 2017, William Blair wrote that Acuity's "Growth Slowdown Is Perplexing," stating that "[w]e and

many clients are having a hard time reconciling why lighting is suddenly so weak when the rest of the economy is generally picking up."

51.     Similarly, on April 5, 2017, Roth Capital Partners wrote that Acuity's "near-term growth outlook of 'flat to slightly positive' directly contradicts that of the lighting industry, which sees a robust June quarter," highlighting the fact that "Acuity management refers to private data sets in its assessment of industry trends, where we question the reliability, and note there is zero transparency."

52.     As a result of the above-referenced conduct, in 2018, Acuity, Nagel, Reece, and Black were named as defendants in the Securities Action, which remains pending before this Court.  The Securities Action alleges violation of §§10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder.  The Securities Action specifically challenges defendants' public statements on October 7, 2015, January 8, 2016, April 6, 2016, and June 29, 2016, as well as defendants' allegedly unlawful insider stock sales.

53.     On August 12, 2019, the Honorable Mark H. Cohen of the U.S. District Court for the Northern District of Georgia sustained (in part) the shareholder plaintiffs' claims for violations of §§10(b) and 20(a) of the Exchange Act against the Company, notwithstanding the materially heightened pleading standards imposed by the PSLRA.  In so doing, Judge Cohen concluded, *inter alia,* that

considering allegations based on the accounts of confidential witnesses, the Acuity officers' access to internal quarterly and daily reports supported an inference of scienter for the Acuity officers related to their public statements discounting the effect of competition.  Judge Cohen further concluded that facts were alleged to show that "sales to Home Depot were sufficiently large to constitute a core part of Acuity's business," and coupled with allegations that the Acuity officers received Quarterly Record Briefs and that defendants Nagel and Reece had access to daily sales reports, "knowledge of sales to Home Depot may be imputed to [Acuity's officers]."  *Acuity*, 2019 U.S. Dist. LEXIS 231099, at *77-*78.  Moreover, Judge Cohen concluded that the size and timing of defendants' challenged insider stock sales during the Securities Action class period supported an inference of scienter.

## DAMAGE AND INJURY TO ACUITY

54.     As alleged above, the statements and events described herein gave rise to the Securities Action being initiated against the Company.  The Securities Action was sustained (in part) on August 12, 2019, and Judge Cohen's order in this regard presages continued damage and injury to Acuity's assets, goodwill, and reputation. *Acuity*, 2019 U.S. Dist. LEXIS 231099.

55.     Acuity has suffered additional damages as well.  For instance, Acuity is suffering and will continue to suffer from what is known as the "liar's discount,"

a term applied to the stocks of companies which have been implicated in improper behavior and have misled the investing public, such that Acuity's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as the Securities Action continues to unfold, Acuity will be further damaged by the professional fees, costs, and expenses incurred in connection with that matter, not to mention the decline in productivity associated with the distractions that come with exposure to such litigation.

56.     Defendants have not fared nearly so badly. In addition to the $49 million in proceeds they reaped from their illicit insider trades – which again, were found by Judge Cohen to support an inference of defendants' scienter in the Securities Action – from Acuity's fiscal year 2016 through the present, defendants have collectively pocketed at least $72.6 million in compensation not justified by the Company's performance while under their stewardship. Nonetheless, the Board has not – and will not – protect the Company's interests by bringing legal action against the directors and officers responsible for this debacle.

### THE BOARD'S DISDAIN FOR
### PLAINTIFFS' LITIGATION DEMANDS

57.     Plaintiffs incorporate ¶¶1-56.

58.     It is axiomatic that the directors of a Delaware corporation, like Acuity, owe the corporation and its stockholders "'an affirmative duty to protect the interests

of the corporation.'" *Pfeiffer v. Toll*, 989 A.2d 683, 695 n.3 (Del. Ch. 2010) (quoting 1 Edward P. Welch et al., *Folk on Delaware General Corporation Law* §141.2.1.2, at GCL-IV-26 (5th ed. 2006)).  Moreover, Delaware directors have "'an obligation to refrain from conduct that would injure the corporation and its stockholders.'"  *Id.* As the Delaware Supreme Court recognized in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985), the directors of a Delaware corporation must "protect the corporate enterprise . . . from harm reasonably perceived, irrespective of its source."

59.    Here, the source of the harm to the Company arises from the multi-million-dollar damages claims that investors have asserted against Acuity based largely, if not entirely, upon the alleged false and misleading statements made by defendants, as well as the associated litigation costs, expenses, and fees.  On August 12, 2019, this Court sustained (in part) the claims for securities fraud against Acuity and the defendants, based on defendants' false and misleading statements.  *Acuity*, 2019 U.S. Dist. LEXIS 231099.  Acuity's damage claims and other relief against defendants are corporate assets that the Board has an obligation to protect and preserve.  *Nagy v. Bistricer*, 770 A.2d 43, 55-56 & n.23 (Del. Ch. 2000) (finding breach of fiduciary duty claims are assets of a company); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 548 (Del. Ch. 2015).  However, following

plaintiffs' formal demands, initiated in January 2020, the Board has not taken steps to protect and preserve the Company's valuable claims for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, or contribution and indemnification against defendants.

60.    On January 31, 2020, plaintiff Davis issued a formal written pre-suit demand to the Acuity Board under Delaware law (the "January 21, 2020 Demand"). Therein, plaintiff Davis demanded that Acuity, acting by and through its Board, take critical steps to preserve and protect the Company's valuable claims against defendants.  Specifically, plaintiffs demanded that the Board:  (a) undertake (or cause to be undertaken) an independent internal investigation into Nagel, Reece, and other Acuity insider's violations of Delaware and federal law; and (b) commence a civil action against Nagel and Reece (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against defendants) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.

61.     Plaintiffs described how defendants have violated the core fiduciary duty principles described herein through their wrongful conduct described above and in the Securities Action.  To redress these wrongs and prevent such wrongdoing from occurring again in the future, plaintiffs demanded, *inter alia*:

- the Board should require the Acuity Officers to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, or any related or similar litigation;

- the Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein . . . ;

- the Board should require the Acuity Officers to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

- the Board should require [defendants] to disgorge all profits realized through their sales of Acuity stock at artificially inflated prices while they were in possession of material, adverse nonpublic information;

- the Board should require the Acuity Officers to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and

- the Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future.

January 21, 2020 Demand at 13-14.

62.     On March 3, 2020, plaintiff St. Clair issued a formal written pre-suit demand to the Acuity Board under Delaware law (the "March 3, 2020 Demand"). Therein, plaintiff St. Clair demanded that Acuity, acting by and through its Board, take critical steps to preserve and protect the Company's valuable claims against defendants.  Specifically, St. Clair demanded that: (a) "the Board cause Acuity to file a Complaint for Breach of Fiduciary Duty of Care, Breach of Fiduciary Duty of Loyalty, Aiding and Abetting Breaches of Fiduciary Duties, Unjust Enrichment, Contribution and Indemnification against [defendants] in the U.S. District Court for the Northern District of Georgia"; and (b) "the Board shall cause Acuity to immediately file an Amended Answer in the Securities Action, and/or file a Cross-Complaint against [defendants] in the Securities Action, asserting claims for relief for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Unjust Enrichment, Contribution, Indemnification and such other relief as the Board deems necessary to protect Acuity's interests against [defendants]."  March 3, 2020 Demand at 11.  Together, plaintiffs' January 31, 2020 Demand and March 3, 2020 Demand are referred to as the "Demands."

63.     In a letter dated May 27, 2020, Mr. Edward J. Hardin of Rogers & Hardin informed plaintiffs' counsel that the Acuity Board appointed a Demand Evaluation Committee ("DEC") comprised of Messrs. Robert F. McCullough, W.

Patrick Battle, and G. Douglas Dillard. Despite this gesture, for the over a year the Demands have been treated by the Board, via the DEC (together, "Board") with disdain. Although legally bound to undertake an independent investigation in good faith and either accept or reject the Demands, the Board has chosen to do nothing. The Board has functionally ignored the Demands for over a year, and this derivative action should therefore proceed.

64. The Board's conduct is antithetical to its affirmative duty to protect the interests of Acuity and to refrain from conduct that would injure the corporation. By failing to act upon the Demands, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal*, 493 A.2d at 954. Therefore, by virtue of its own actions, the Board has refused the Demands. Accordingly, plaintiffs may proceed with this derivative action designed to protect the interests of Acuity vis-à-vis the defendants by, among other things, perfecting the Company's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution and indemnification, and related damages against defendants.

### COUNT I

**Breach of Fiduciary Duty**
**(Against All Defendants)**

65. Plaintiffs incorporate ¶¶1-64.

- 31 -

66.     Defendants, and each of them owed, and owe, Acuity and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, defendants were required to disseminate accurate, truthful, and complete information to shareholders always.

67.     In direct violation of these duties, defendants, and each of them, knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the effects of increased competition on the Company's business, and, as a result of the foregoing, Acuity's public statements were materially false and misleading at all relevant times.  Through their fraudulent scheme, defendants artificially inflated the Company's financials, and its stock price.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

68.     In addition, defendants breached their fiduciary duty of loyalty to the Company by possessing and using material, non-public Company information, including: (a) the negative impact of increased LED manufacturing competition on Acuity's business; and (b) declining sales to the Company's largest and most

important customer, to make the trades alleged herein and because they were motivated, in whole or in part, by the substance of that information.

69.    As a direct and proximate result of defendants' failure to perform these fiduciary obligations, Acuity has sustained significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

70.    Plaintiffs, on behalf of Acuity, have no adequate remedy at law.

## COUNT II

### Unjust Enrichment
### (Against All Defendants)

71.    Plaintiffs incorporate ¶¶1-64.

72.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of, and to the detriment of, Acuity.

73.    Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Acuity.

74.    Plaintiffs, as shareholders and representatives of Acuity, seek restitution from defendants, the imposition of a constructive trust over defendants' proceeds from their misconduct, and/or an order requiring defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

75.     As a direct and proximate result of defendants' misconduct, the Company has suffered significant damages, as alleged herein.

76.     Plaintiffs, on behalf of Acuity, have no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against All Defendants)

77.     Plaintiffs incorporate ¶¶1-64.

78.     Defendants, and each of them, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Acuity's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times. It resulted in continuous, connected, and ongoing harm to the Company.

79.     Defendants, and each of them, wasted corporate assets by: (a) paying excessive compensation and bonuses to certain of its executive officers; and (b) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions, including defending the Company and its officers against the Securities Action.

80.     As a result of the waste of corporate assets, defendants are liable to the Company.

81.     As a direct and proximate result of defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

82.     Plaintiffs on behalf of Acuity, have no adequate remedy at law.

## COUNT IV

### For Contribution for Violations of §§10(b) and 21D of the Exchange Act
### (Against All Defendants)

83.     Plaintiffs incorporate ¶¶1-64.

84.     Defendants Nagel, Reece, and Black are named defendants in the Securities Action.

85.     Acuity is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, *inter alia*, violations of §10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of defendants as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

86.     Defendants, as officers, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including

the content of public statements about Acuity, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and Rule 10b-5.   Further, defendants are liable under §21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

87.   As a result, defendants damaged Acuity and are liable to the Company for contribution.

## COUNT V

### For Contribution and Indemnification Under Delaware Law
### (Against All Defendants)

88.   Plaintiffs incorporate ¶¶1-64.

89.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants.

90.   Acuity is named as a defendant in the Securities Action.   If Acuity is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of defendants as alleged herein.

91.     Accordingly, Acuity is entitled to all appropriate contribution or indemnification from defendants, who are responsible for exposing Acuity to liability under Delaware contribution and indemnification law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Against all defendants for the damages sustained by the Company as a result of defendants' wrongdoing as alleged herein;

B.     Awarding to Acuity restitution from defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

C.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  October 1, 2021                    **JOHNSON FISTEL, LLP**

                                        By:  _/s/ Michael I. Fistel, Jr._

- 37 -

Michael I. Fistel, Jr.
Georgia Bar No. 262062
William W. Stone
Georgia Bar No.: 273907
Oliver tum Suden
Georgia Bar No.: 226685
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
  williams@johnsonfistel.com
  olivert@johnsonfistel.com

**ROBBINS GELLER RUDMAN**
**& DOWD LLP**

Travis E. Downs III
Benny C. Goodman III
Erik W. Luedeke
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
Email: tdowns@rgrdlaw.com
  bgoodman@rgrdlaw.com
  eluedeke@rgrdlaw.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: brett@shumanlawfirm.com

*Attorneys for Plaintiffs*

**VANOVERBEKE, MICHAUD &
TIMMONY, P.C.**

Thomas C. Michaud
79 Alfred Street
Detroit, MI  48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email: tmichaud@vmtlaw.com

*Additional Counsel for Plaintiff City
of St. Clair Shores Police and Fire
Retirement System*

**VERIFICATION**


I, James Haddad, Chairman, on behalf of City of St. Clair Shores Police and Fire Retirement System, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint ("Complaint"), and that the fund authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 30 day of ___September___, 2021.

CITY OF ST. CLAIR SHORES POLICE AND
FIRE RETIREMENT SYSTEM


By: _____

JAMES HADDAD
Chairman

## **VERIFICATION**

I, Stephen L. Davis, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: _9/25/2021_____

Stephen L. Davis

—74A12AC8512744E...

(Signature of Stephen L. Davis)